## In re Vitagraph, Inc.

*Wolf, Block, Schorr & Solis-Cohen*, for appellant; *John R. Jones*, contra.

MARTIN, P. J., June 28, 1928.—Appellant intending to present a motion-picture film for public exhibition, submitted it for approval to the State Board of Censors.

Instead of printing upon the film the descriptive language, and that which represented the words of the actors, appellant proposes to employ a "Vita-graph"—an apparatus consisting of a disk record like those used on a phonograph and revolved on a turntable. A needle and sound-box are placed upon the record, and the revolution of the record reproduces the sound, which is conveyed to the audience by an amplifier. The speed with which the turntable is revolved corresponds to that of the reel on which the motion picture appears, so that the language and action are co-ordinated. The correspondence of speed is produced by the connection of the sound-reproducing machine and the moving-picture machine with a common axle.

The censors requested appellant to inform them as to the language proposed to be employed as part of the picture, to enable them to exercise an intelligent discretion in determining whether or not the picture as a whole is moral and proper, or sacrilegious, obscene, indecent or immoral, or such as tends, in the judgment of the board, to debase or corrupt morals. Appellant refused to submit to the board the language they proposed to employ in the picture. In the absence of this information, the board disapproved the film and informed appellant that without a knowledge of the language to be uttered in connection with the picture, it was impossible to determine whether the motion picture is moral and proper or will tend to debase or corrupt morals.

The Act of May 15, 1915, P. L. 534, creating the Board of Censors, provides, in section 3, the method of appointing members of the board, and in section 6 defines the duties, powers and prerogatives of the board to examine or supervise the examination of all films, reels or views to be exhibited or used in Pennsylvania, and requires that the board approve such films, reels and views which are moral and proper, and disapprove such as are sacrilegious, obscene, indecent or immoral, or tend, in the judgment of the board, to debase or corrupt morals.

"The power and authority given the board to determine the matters properly brought before them in the exercise of their discretion is not to be understood [as] judicial discretion, but such discretion as may be expected

from persons well qualified by education and experience to act as censors under the act; that is to say, persons with education and experience sufficient to enable them to understand the purpose and object of the particular legislation with which they have to deal, and its several provisions, and for them to know what are the common standards of morality which the act seeks to protect, and to act intelligently when it becomes their duty to discriminate fairly between pictorial exhibitions which are consonant with the established canons of morality and such as tend to lower and degrade such standards. It follows that the discretion here committed to the Board of Censors is not to be narrowed by technical and official rules when the exercise is one of judicial discretion; nor is it possible to measure that discretion by any fixed standards. What is required is that it must be commensurate with the intelligent understanding by the board of the object and purpose of the law, associated with an honest desire and endeavor on its part to impartially enforce its provisions:" Goldwyn Distributing Corp., 265 Pa. 335, 341, 342.

"Where such inquiry arises, the investigation starts with the presumption that the tribunal making the order or decree appealed from acted within the reasonable scope of its power and discretion, and it can be called to answer only as the party complaining, upon whom rests the burden, can show that the decision of the board rests upon some ground that did not authorize the exercise of discretion. . . . The general rule is that the *onus* is upon the appellant to show affirmatively that the decision was made on a ground not involving the exercise of discretion—(citing) 3 Corpus Juris, 471, § 289:" Goldwyn Distributing Corp., *supra*, 342.

"The evident intent was to grant the right of appeal to the Common Pleas, so that tribunal could correct any arbitrary and oppressive orders which the Board of Censors might make, and nothing more; in other words, that the court might reverse the censors when the latter were guilty of an abuse of discretion. This is the ordinary rule to which, on appeal, even this court restricts itself in reviewing an exercise of discretion, particularly of administrative officials:" Goldwyn Distributing Corp., *supra*, 339, 340.

"In view of the unqualified right given the board to determine such question upon its own judgment and the utter impracticability of submitting it to other arbitrament, to the extent indicated must the complainant's proof reach to justify interference on the part of the court with the board's discretionary power, except in cases where the alleged abuse is attributed to perversity of will, passion, prejudice, partiality or moral delinquency; where such is the case, a very different rule obviously obtains:" Goldwyn Distributing Corp., *supra*, 343.

Section 24 of the Act of May 15, 1915, P. L. 534, 539, requires every person intending to sell, lease, exhibit or use films, reels or views in Pennsylvania to furnish the board, when the application is made for approval, a description of the film, reel or view to be sold, exhibited or leased and the purpose thereof, and to submit the film, reel or view to the board for examination.

"Pictures will be judged, as a whole, with a view to their total effect; those betraying evil in any form which may be easily remembered or emulated will be disapproved:" Goldwyn Distributing Corp., *supra*, 345.

It is contended by appellant that the spoken words announced from a vitagraph, while part of the "exhibition," are no part of the film, and are not within the power of the board to censor.

If this narrow construction is adopted, a picture disapproved by reason of printed titles and words accompanying the film being determined by the censors to produce a picture that is immoral, improper, sacrilegious, obscene

or indecent may be submitted for approval with the objectionable wording eliminated, and, after being approved as harmless, be exhibited with all the debasing and corrupting features restored by publishing the accompanying language on a vitagraph as a part of the "exhibition."

The Act of 1915, creating the Board of Censors and defining their powers, clearly indicates the purpose of the legislators to protect the public against the exhibition of reels that are sacrilegious, obscene, indecent or, in the judgment of the board, tend to debase or corrupt morals. To construe the act as vesting the Board of Censors with power to prevent the exhibition of films which corrupt public morals when exhibited with printed titles, and to hold the board powerless to prevent an exhibition of the films when the same debasing features are published as part of the picture by a vitagraph, would result in neutralizing and destroying the act of assembly.

That the vitagraph is a mechanism unknown to the world when the Act of 1915 was passed does not prevent the remedial provision of the act being extended to the suppression of an evil made possible by its employment as part of a picture.

"A general law may, and frequently does, originate in some particular case or class of cases which is in the mind of the legislature at the time, but so long as it is expressed in general language, the courts cannot, in the absence of express restrictions, limit its application to those cases, but must apply it to all cases that come within its terms and its general purpose and policy. Hence, statutes framed in general terms apply to new cases that arise, and to new subjects that are created from time to time and which come within their general scope and policy. It is a rule of statutory construction that legislative enactments in general and comprehensive terms, prospective in operation, apply alike to all persons, subjects and business within their general purview and scope coming into existence subsequent to their passage. Thus, an automobile may come within the provisions of an act relating to vehicles generally, although the statute was passed before the invention of automobiles; and an act passed before moving pictures came into vogue, to prohibit the opening of places of public amusement on Sunday, may be applied to moving-picture shows, if the terms of the statute are broad enough to embrace such places of amusement. Likewise, a statute against gaming may be so framed as to cover gaming devices that may later be invented or become known. Tariff laws are made for the future, and the fact that at the date of an act imposing duties goods of a certain kind had not been manufactured does not withdraw them from the class to which they belong when the language of the statute clearly and fairly includes them. A fellow-servant statute which, on its face, applies to commercial railroads may be held to apply to 'logging' railroads, though they were unknown when the statute was enacted. A provision in a railroad charter defining the rights and duties of the company with relation to streets and highways may be held to be applicable, not only to existing streets and highways, but also to those subsequently laid out and opened. An act limiting the time of prosecutions under penal statutes may extend as well to penalties created after as before the act. . . :" 25 Ruling Case Law, 778, 779.

A construction which would permit so palpable an evasion of the law, as the transmission of the printed words prohibited on a film to the disk of a vitagraph to be announced as part of the picture, would result in an absurdity.

In Nichols v. Halliday, 27 Wis. 406, it was held: "If one interpretation would lead to an absurdity and the other not, we must adopt the latter; so

that interpretation which leads to the more complete effect which the legislature had in view is preferable to another." Com. *v.* Quaker City Cab Co., 287 Pa. 161.

The Board of Censors was right in demanding that the language employed in conjunction with the proposed picture should be submitted to them before the film receives the approval of the board.

And now, to wit, June 28, 1928, the appeal of Vitagraph, Inc., from the final order of disapproval of the State Board of Censors of the motion-picture film entitled "Polly Moran, the Movie Chatterbox," is dismissed and the action of the Board of Censors affirmed. Appellant to pay the costs.